AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

ORIGINAL FILED

MAR 1 3 2018

WILLIAM T. WALSH, CLERK

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| CARL CHIANESE | ) | Mag. No. 18-5510 (KMW) |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 2016 through March 2018___ in the county of ___Atlantic___ in the

_____ District of ___New Jersey___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21 U.S.C. Section 846 and 841(b)(1)(A) | SEE ATTACHMENT A |

This criminal complaint is based on these facts:

PLEASE SEE ATTACHMENT B (AFFIDAVIT)

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Mark Hindle, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 13, 2018

_____
*Judge's signature*

City and state:        Camden, New Jersey

Honorable Karen M. Williams, U.S. Magistrate Judge
*Printed name and title*

CONTENTS APPROVED

UNITED STATES ATTORNEY

BY: _____

PATRICK C. ASKIN
Assistant United States Attorney

Date: _____3/12/18_____

## ATTACHMENT A

From at least in or about May 2016 through in or about March 2018, in Atlantic County and Cape May County, in the District of New Jersey and elsewhere, defendants

**JOSEPH SERVIDIO,**
**CARL CHIANESE and**
**MICHAEL GALLICCHIO**

did knowingly and intentionally conspire and agree with each other and others to distribute and to possess with intent to distribute 50 grams or more of methamphetamine, 100 grams or more of a mixture and substance containing heroin and detectable amounts of mixtures and substances containing other controlled substances, including fentanyl, and tramadol, all controlled substances under Schedule I, Schedule II and Schedule IV, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

**ATTACHMENT B**

**AFFIDAVIT**

Mark Hindle, your affiant, having been sworn according to law, deposes and says:

1.    I have been a special agent of the FBI for approximately 18 years. I am presently assigned to the Atlantic City Resident Agency of the Newark Division, and have been for the past 13 years.  I have been trained in various aspects of federal law enforcement, and during my employment with the FBI I have been involved in numerous investigations and prosecutions, including those involving criminal enterprises and organized crime, white collar crime, public corruption, violent crime, narcotics violations, and money laundering.  In the course of those investigations, I have utilized and monitored court authorized wiretaps, conducted surveillance, executed search warrants, debriefed witnesses and cooperating witnesses, and utilized undercover employees. I have acted as the "case" agent or lead investigative agent in numerous criminal investigations.

**PURPOSE OF AFFIDAVIT**

2.    This Affidavit is being submitted in support of an application for criminal complaints and arrest warrants for Joseph SERVIDIO, Carl CHIANESE, and Michael GALLICCHIO, charging them with conspiracy to distribute and possess with the intent to distribute controlled substances, including heroin, fentanyl,

1

tramadol and methamphetamine, contrary to Title 21, United

States Code, Sections 841(a)(1) and 841(b)(1)(A), in violation

of Title 21, United States Code, Section 846 (hereinafter the

"TARGET OFFENSE").

3.    Based upon your Affiant's personal participation in

this investigation, your Affiant submits that the facts

contained in this Affidavit show that there is probable cause to

believe that Joseph SERVIDIO, Carl CHIANESE, and Michael

GALLICCHIO have conspired to distribute and possess with the

intent to distribute controlled substances, including heroin,

fentanyl, tramadol, and methamphetamine, contrary to Title 18,

United States, Code, Sections 841(a)(1) and 841(b)(1)(A), in

violation of Title 21, United States Code, Section 846.

## BASIS OF INFORMATION

4.    Your Affiant makes this affidavit based upon personal

knowledge derived from participation in this investigation and

upon information believed to be reliable from the following

sources:

a.      your Affiant's experience investigating

organized criminal enterprises, money laundering operations,

and drug trafficking organizations;

b.      oral and written reports, and documents

about this investigation that your Affiant has received from

2

agents of the FBI, and other federal, state and local law
enforcement agencies;

        c.    discussions concerning this investigation
between your Affiant and experienced organized crime
investigators, and drug trafficking investigators;

        d.    physical surveillance conducted by the FBI,
and other federal, state and local law enforcement agencies,
the results of which have been reported to your Affiant
either directly or indirectly;

        e.    public records;

        f.    telephone call detail records, and telephone
subscriber information;

        g.    grand jury records;

        h.    statements of Confidential Sources and
witnesses;

        i.    consensually recorded telephone calls, text
messages and meetings; and

    5.    controlled purchases of heroin/fentanyl, tramadol, and
methamphetamine.

    6.    Since this Affidavit is being submitted for the
limited purpose of establishing probable cause for the Court's
issuance of criminal complaints and arrest warrants, your
Affiant has not included each and every fact known to him
concerning this investigation.  Rather, your Affiant has set

forth the facts believed to be necessary to establish probable
cause for the criminal complaints and arrest warrants for Joseph
SERVIDIO, Carl CHIANESE, and Michael GALLICHIO for conspiring to
possess with the intent to distribute and distribution of
heroin, fentanyl, tramadol, and methamphetamine.

### RELIABILITY OF INFORMATION

7.   During the course of this investigation case agents
received information from a confidential source (hereinafter
"CS-1") concerning the illegal activities of JOSEPH SERVIDIO and
other members and associates of the Philadelphia "La Cosa
Nostra" ("LCN"), regularly called the "Mafia" or the "Mob,"
which is a secret criminal organization.[1]  CS-1 began providing
information (based on personal dealings) to the FBI in 2015. CS-
1 is a made member of the Philadelphia LCN, and is personally
familiar with numerous other members and associates, and has
provided detailed information as to the workings of the
Philadelphia LCN, including the criminal activity of its
members. CS-1 has proven to be credible, and the information CS-
1 has provided has been independently verified through various
means, including, but not limited to, telephone record data
analysis, database checks, physical surveillance, information
received from other law enforcement entities, information

---

[1] Additional information regarding LCN is set forth below in this affidavit.

4

received from other confidential sources and consensually

monitored conversations and meetings[2].

    8.    During the course of this investigation case agents

received information from a confidential source (hereinafter

"CS-2") concerning the drug trafficking activities of JOSEPH

SERVIDIO and other members and associates of the Philadelphia

_____

[2] CS-1 has agreed to enter into a cooperation plea agreement with the
government and has been cooperating with Special Agents of the FBI in
investigations for approximately two years. CS-1's agreement to enter into a
cooperation plea agreement with the government is related to CS-1's
participation in the staged robbery of a pawn shop, which was designed to
deceive an insurance company.  CS-1 has admitted to participating in the
staged armed robbery and it is anticipated that he will plead guilty to fraud
charges for that offense. It should be noted that an FBI supervisor, not
involved with the current investigation, believed that CS-1 was not truthful
about whether the robbery was staged.  However, after consideration of all of
the evidence, which included reviewing security camera footage of the
"robbery" and consensual recordings, it remains the position of the Newark
FBI that CS-1 is corroborated and that he participated in a staged robbery as
part of a scheme to deceive an insurance company. As part of CS-1's
cooperation with the government, CS-1 has agreed to consensually record
conversations with the targets of the investigations with which he is
involved and testify if called upon by the government in exchange for the
government providing sentencing consideration (downward departure or similar)
on the staged robbery. CS-1 has an extensive prior criminal history including
aggravated assault, robbery, contempt of court, robbery by threats, firearms
possession and third-degree murder. CS-1 has been reimbursed by the FBI for
expenses incurred during the course of this investigation.  Further, the
Pennsylvania State Police (PSP) investigated a business operated by CS-1 for
fraud allegations. Subsequently, Newark FBI initiated a similar investigation
regarding similar allegations. PSP has closed their investigation and
provided their investigative file to the FBI. CS-1 is cooperating with that
FBI fraud investigation as well, which is continuing and depending on the
outcome of that investigation, CS-1 may plead guilty to additional criminal
charges related to the alleged business fraud, in the event those allegations
can be substantiated.  Regardless, your Affiant believes that the information
provided by CS-1, as summarized in this affidavit, is truthful and accurate
and has been corroborated through numerous methods as described in this
affidavit.

LCN. CS-2 began providing information (based on personal dealings) to the FBI in April 2017. CS-2 has a criminal history involving a felony conviction for drug trafficking. CS-2 has proven to be credible, and the information CS-2 has provided has been independently verified through various means, including, but not limited to, telephone record data analysis, database checks, physical surveillance, information received from other law enforcement entities, information received from other Confidential Sources and consensually monitored conversations and meetings.

### BACKGROUND AND SUMMARY

9.    Through your Affiant's training and experience, along with personal participation in the investigation described herein, your Affiant has become familiar with the operation of organized crime groups in Philadelphia and the surrounding areas, including the efforts of persons involved in such activity to avoid detection by law enforcement. Your Affiant knows that the organized crime group referred to as "La Cosa Nostra" ("LCN"), regularly called the "Mafia" or the "Mob," is a secret criminal organization. It has a hierarchical structure and its own system of "laws." It is comprised of "families," each of which controls a designated area. After having served an apprenticeship in crime, individuals can become members of the

LCN in a secret initiation ceremony. Your Affiant has also
become familiar with the structure and methods of the LCN,
including the LCN's hierarchy of positions, the "tribute"
commonly paid to superiors in the organization, the variety of
criminal offenses committed by LCN members and associates, the
oath members take not to divulge the secrets of the
organization, and the wariness of the organization toward
informants, including the commitment to take violent action
against those who cooperate with law enforcement in any way.

10. Your Affiant is familiar with the means and methods by
which the LCN controls geographical areas and engages in, and
profits from, drug trafficking and other illegal activities
within those areas. Your Affiant is aware that the Philadelphia
LCN has historically operated in and controlled Philadelphia,
its surrounding suburbs, and southern New Jersey, including
Atlantic City, as well as having members and associates
operating in northern New Jersey, and the Boston, Massachusetts
area.

11. Through the use of confidential sources ("CS"s) and
Undercover Law Enforcement Officers ("UCE"s), JOSEPH SERVIDIO
has been identified as a "made member" or "soldier" of the
Philadelphia LCN. Through consensually recorded meetings and
conversations, it has been determined that SERVIDIO is
distributing heroin/fentanyl, methamphetamine, marijuana and

possibly cocaine. SERVIDIO has also been recorded discussing other criminal activity including bank fraud through a check kiting scheme, potential robberies, staging robberies as an insurance fraud scheme, as well as obtaining firearms to be used in committing these crimes, including in furtherance of his drug trafficking activities. SERVIDIO introduced a CS and a UCE to MICHAEL GALLICCHIO who was alleged by SERVIDIO to be his supplier for heroin and fentanyl. SERVIDIO also introduced a CS and a UCE to CARL CHIANESE and alleged that they could obtain methamphetamine directly from CHIANESE. Recently, Philadelphia FBI developed a CS in a position to provide information as to SERVIDIO's source of supply for methamphetamine. However, due to the CS's cooperation with law enforcement, the CS was unable to maintain the same level of involvement in the conspiracy, which disrupted SERVIDIO's supply of methamphetamine. On June 11, 2017, during a controlled buy of methamphetamine SERVIDIO informed a CS and UCE that he had another, or new, source of supply for methamphetamine.

12. In addition to gathering evidence of the direct involvement of SERVIDIO and others in criminal activity such as drug trafficking, case agents have been able to obtain consensual recordings of numerous meetings of members and associates of the Philadelphia LCN wherein criminal acts attributed to the organization are discussed, and the structure

and nature of the hierarchical relationships within the organization were described. This includes recorded conversations in which members discussed the payment of a tribute to higher ranking individuals from the proceeds of various criminal activities.

13.   On May 17, 2016, CS-1 had a meeting with JOSEPH SERVIDIO at SERVIDIO's residence in Marmora, New Jersey, wherein CS-1 introduced SERVIDIO to a UCE ("UCE-1"). During the meeting CS-1, SERVIDIO and UCE-1 discussed SERVIDIO's ability to supply marijuana, heroin, prescription pills, and methamphetamine. SERVIDIO said to (UCE-1) "we got to get you situated with something right? What could, what could, what could we get rid of?" (meaning what drugs can you sell) UCE-1 said, "What do you want to get rid of?"  SERVIDIO said, "The kids, the kids, the kids are making uh, Oxycodone…but, they're not, you know, they're not perfect…they're putting a little bit of uh, heroin or something in there, you know." Later SERVIDIO said, "…the other guy's got the crystal meth." SERVIDIO offered to introduce UCE-1 to an individual referred to as "Mike" who could supply heroin and possibly other drugs. ("Mike" was later identified as MICHAEL GALLICCHIO). This meeting was audio recorded by UCE-1 and CS-1, and surveilled by case agents.

14. On June 2, 2016, at approximately 11:11 a.m., CS-1 placed an outgoing call to SERVIDIO PHONE 3[3] wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation they discussed meeting with MICHAEL GALLICCHIO to discuss or conduct drug trafficking. SERVIDIO said, "…I'm with my buddy right now, our friend…he's here, he'll say hello, you're on Bluetooth." GALLICCHIO could then be heard saying, "How you doin' bro?" CS-1 said, "Hey Mikey, how are you pal?" Later in the conversation SERVIDIO said, "Alright but I should be there (Marmora, New Jersey) all next week, and Mike (GALLICCHIO) will come down, you know." CS-1 said, "Yeah, you know, it's no hurry…" SERVIDIO said, "But it is a hurry because the sooner you start something (begin drug trafficking with GALLICCIO) the better it is." SERVIDIO was informing CS-1 that he and GALLICCHIO would be

---

[3] Joseph SERVIDIO, Carl CHIANESE and Michael GALLICCHIO all used multiple phones throughout 2016-2018 to communicate with each other and other criminal associates about their criminal activity. With respect to the use of phones by SERVIDIO and CHIANESE, there are numerous references throughout this affidavit to particular phones used by SERVIDIO and CHIANESE and the phones are referred to by reference to an internally assigned numeric number (e.g. "SERVIDIO PHONE 2") The affiant and other FBI agents used this system to just keep track of the phones by phone number for each individual subject throughout the investigation, starting with numbering, for example "SERVIDIO PHONE 1" as the first phone to be associated by the assigned agents as belonging to and/or being utilized by Joseph SERVIDIO. These defendants used multiple phones throughout the time frame of the investigation, "dropping" the use of phones and switching to other handsets with new phone numbers at times to thwart electronic surveillance by law enforcement. They also used certain phones exclusively for criminal activity with a limited number of associates and SERVIDIO and CHIANESE and others would refer to these cell phones as "the office" or the "office phone." GALLICCHIO also spoke of frequently changing phones and using "throw away" phones.

available to meet the following week in order to introduce
GALLICCHIO to UCE-1 for the purpose of conducting drug
trafficking. This call was audio recorded by CS-1, and analysis
of call detail records confirmed it took place.

15.   On June 8, 2016, CS-1 and UCE-1 had a meeting with
multiple members of the Philadelphia LCN, including INDIVIDUAL 1
in Ventnor, New Jersey. During the meeting INDIVIDUAL 1
discussed with UCE-1, among other things, UCE-1's interest in
the transportation and distribution of marijuana. This meeting
was audio recorded by UCE-1 and CS-1, and surveilled by case
agents.

16.   After the meeting (referenced above) on June 8, 2016,
at approximately 10:21 a.m., CS-1 placed an outgoing call to
SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH
SERVIDIO. During the conversation they discussed CS-1 and UCE-1
meeting with SERVIDIO at SERVIDIO's residence. SERVIDIO said,
"Yeah, who's gonna come?" CS-1 said, "It's just probably gonna
be me, me and my, my, my other friend (UCE-1), if I can yeah…"
This conversation was audio recorded by CS-1, and analysis of
call detail records confirmed it took place. CS-1 and UCE-1 then
traveled to a residence of JOSEPH SERVIDIO in Marmora, New
Jersey. At the residence, along with SERVIDIO, CS-1 and UCE-1
met with CARL CHIANESE and MICHAEL GALLICCHIO. Prior to engaging
in conversation inside the residence, all of the individuals

placed their cellular telephones on the back deck of the
residence. Based on training and experience, and consultation
with CS-1, your Affiant knows that members of the Philadelphia
LCN often avoid the presence of cellular telephones in personal
meetings in an attempt to thwart electronic surveillance efforts
by law enforcement.  UCE-1 and GALLICCHIO then had a private
conversation in the basement of the residence wherein they
discussed GALLICCHIO's ability to supply heroin. GALLICCHIO
provided UCE-1 with 19 blue colored pills that GALLICCHIO stated
were "heroin" pressed into pill form. GALLICCHIO had
approximately 200 additional pills that were not provided to
UCE-1. UCE-1 said, "Okay, so you're making these?" GALLICCHIO
said, "Yeah, these are being made, but now, that's what I was
trying to explain to him (SERVIDIO), I'm waiting to get the new
machine done…" UCE-1 said, "Now are you selling them as oxy's
(Oxycodone)?" GALLICCHIO said, "They, they say it right on it.
Thirties (pills are stamped "30"[4]). Yeah…some of them are hit or
miss. Some of them are stronger than others" (meaning contain
more drug quantity).  Later in the conversation GALLICCHIO said,
"…they (the pills) should be fucking ten times better…I had them
perfect that one time and then the machine blew the fuck up on
me." Based on the subsequent investigation, your Affiant

---

[4] Pills obtained in this investigation were stamped, sometimes including "30", which mimicked
commercially available 30 milligram Oxycodone pills.

believes GALLICCHIO was telling UCE-1 that the quality, and drug content, of the pills varies due to the process GALLICCHIO was using to produce them. UCE-1 then explained to GALLICCHIO how UCE-1 would use specific phones to communicate with GALLICCHIO regarding drug transactions. GALLICCHIO said, "I got a place where I get the phones from…I throw them the fuck away every month." Your Affiant knows that drug dealers often change, or "throw" cellular telephones in an effort to avoid electronic surveillance by law enforcement. This meeting was audio recorded by CS-1 and UCE-1, and surveilled by case agents. The 19 pills purported to be heroin were sent to the DEA Laboratory where analysis determined they contained no heroin.

17.   On June 13, 2016, CS-1 had a meeting with JOSEPH SERVIDIO and INDIVIDUAL 1 in Northfield, New Jersey. During the meeting, SERVIDIO informed CS-1 that he had been instructed not to conduct criminal activity in the Atlantic City area. SERVIDIO said, "He knows that they (Philadelphia LCN hierarchy) don't want me to do nothing illegal." SERVIDIO then assured CS-1 that he (SERVIDIO) did what he wanted to. Based on the investigation, including subsequent consensually recorded meetings and telephone calls, and interviews of CS-1, your Affiant believes that the instruction given to SERVIDIO to not engage in criminal activity with members and associates of the Philadelphia LCN that were located in the Atlantic City area represented the

higher ranking members' exertion of authority and control over
SERVIDIO, including the assurance that a portion of the proceeds
from criminal activity are "kicked up" as "tribute" to the
hierarchy. This meeting was audio recorded by CS-1.

18.  On July 4, 2016, CS-1 had a meeting with INDIVIDUAL 2
at a residence in Atlantic City, New Jersey. Individual 2 was
CS-1's capo in the LCN criminal organization, meaning that CS-1
reported to Individual 2. During the meeting INDIVIDUAL 2 and
CS-1 discussed CS-1's drug trafficking plans/activities, and
INDIVIDUAL 2 gave his approval for CS-1 to be involved in such
activities. CS-1 said, "The next thing I want to let you know,
'cause (INDIVIDUAL 3) got all upset, remember I told you I was
gonna try to make a move (conduct criminal activity) with my
friend?" ( referring to UCE-1) INDIVIDUAL 2 said, "Yeah." CS-1
said, "…where, you know, all I'm trying to do is broker, broker
deals, to make us (Philadelphia LCN) money, from a distance, so
it can't come back (no evidence directly linked to the
Philadelphia LCN)…" Later in the conversation CS-1 said, "…I
won't make a move without checking with you…" INDIVIDUAL 2 said,
"Yeah, do what you got to do." Your Affiant knows CS-1 was
clearing with, or obtaining permission from, INDIVIDUAL 2, CS-
1's capo, to conduct criminal activity. This meeting was audio
recorded by CS-1.

19.  On July 11, 2016, CS-1 had a meeting with several
members and associates of the Philadelphia LCN, including JOSEPH
SERVIDIO, in Northfield, New Jersey. In addition to discussing
other potential criminal activity, SERVIDIO asked CS-1 if UCE-1
wanted "to do any business (drug trafficking) with Mike
(GALLICCHIO)." CS-1 then informed SERVIDIO of the low quality of
the previously supplied heroin pills (at the direction of case
agents, due to laboratory analysis revealing no heroin present
in the pills), and that UCE-1 was in fact interested in
conducting drug trafficking with SERVIDIO, but was concerned
about the quality of the pills. SERVIDIO said, "Yeah it's gonna
be about another month or two because, we need a guy to make a
part…we got a guy, he's a fucking scientist, he wants a drawing,
I'm saying to the guy, because you can't get anybody to make a
fucking pill press…" Your Affiant believes SERVIDIO's mention of
a "scientist" revealed that SERVIDIO and GALLICCHIO were already
aware of reports of other customers' complaints regarding the
recently supplied heroin pills, and was claiming that they had
secured the services of an individual who was in a position to
make a new machine to press heroin into pill form. CS-1 also
discussed the possibility of obtaining cocaine from other LCN
associates. CS-1 claimed that CS-1's source of supply was
charging too much. SERVIDIO said, "I got a kid up north that
would pay thirty-five ($35,000 for a kilogram of cocaine)." CS-1

said, "…does Michael (GALLICCHIO) know how to do that? Does he know how to do the…" SERVIDIO said, "Nah, the dude with the coke (cocaine)…nah but we got, we got the guys that will take (purchase) it for that, you know what I'm sayin', if you can get it for thirty-five." SERVIDIO was telling CS-1 that SERVIDIO knows individuals that will purchase kilograms of cocaine for $35,000. SERVIDIO went on to explain that if CS-1 could purchase a kilogram at that price, and had an individual that could add a "cut" or adulterant to the kilogram to add to the quantity and then "remake" it to it's original "hard" form, then SERVIDIO could sell it. At this point in the investigation case agents are unaware of who SERVIDIO was referring to that would buy cocaine from SERVIDIO. This meeting was audio recorded by CS-1.

20.   CS-1 then drove to Atlantic City, New Jersey, and had a meeting directly with INDIVIDUAL 2. After discussing other criminal activity, INDIVIDUAL 2 also addressed CS-1's criminal activity with JOSEPH SERVIDIO. INDIVIDUAL 2 said, "Here's the thing with Joey Electric (SERVIDIO), he's got to make sure he tells (his capo) what he's doing." Your Affiant knows that INDIVIDUAL 2 was referring to the fact that SERVIDIO must make his capo aware of criminal activity SERVIDIO conducted with CS-1. This meeting was audio recorded by CS-1 and surveilled by case agents.

16

21.   On July 24, 2016, CS-1 had a meeting with JOSEPH
SERVIDIO and INDIVIDUAL 3 at SERVIDIO's residence in Marmora,
New Jersey. During the meeting they discussed cocaine
trafficking (on July 8, 2016, UCE-1 and CS-1 conducted a
controlled purchase of two ounces of cocaine from INDIVIDUAL 3.
However, INDIVIDUAL 3 had acquired more cocaine that UCE-1 had
alleged was too expensive). SERVIDIO said, "You don't wanna take
a kilo of coke to make three, four thousand…not me anyway…we get
caught we are doing twenty years, there's no fuckin sense on
that." SERVIDIO was telling CS-1 and INDIVIDUAL 3 that at the
price INDIVIDUAL 3 was paying, the profit ("three, four
thousand" per kilogram) was not sufficient reward for the risk
of prison time. This meeting was audio recorded by CS-1.

22.   On September 30, 2016, CS-1 had a meeting with JOSEPH
SERVIDIO in Northfield, New Jersey. During the meeting they
discussed several Philadelphia LCN matters, including SERVIDIO's
complaint that MICHAEL GALLICCHIO was having difficulty pressing
higher quality heroin pills. SERVIDIO said, "He's trying to get
that thing (pill press) going, he can't get it…he had it, and
then I don't know what happened. Broke the machine. Got to have
the pins remade." CS-1 said, "That's for the pills?" SERVIDIO
said, "Yeah. He owes me money…" SERVIDIO asserted that another
member of the Philadelphia LCN, who is believed to be a capo,
wanted "everything on the record" with regard to criminal

activity involving CS-1 and SERVIDIO. SERVIDIO said, "…I'm going to be honest with you, they (Philadelphia LCN capos) don't even want us having dinner together." CS-1 said, "Why? What's the reason?" SERVIDIO said, in reference to the LCN member above, that this member wants SERVIDIO's capo to know "every time we get together and know what we're doing, because he says we're making money (through criminal activity) and they're not making money..." CS-1 informed case agents that CS-1 believed that the LCN member wanted to ensure that Philadelphia LCN capos were receiving a tribute, or portion of the proceeds, from criminal activity that occurred when crews under different capos were working together. This meeting was audio recorded by CS-1

23.  On October 18, 2016, CS-1 had a meeting with INDIVIDUAL 2, in Philadelphia, Pennsylvania. During the meeting INDIVIDUAL 2 explained the tribute procedure for the Philadelphia LCN. CS-1 said, "…and then I got to come see you?" INDIVIDUAL 2 said, "Yeah." CS-1 said, "Yeah, I'll come see you the day, the day he (Philadelphia LCN associate) gives it (proceeds from criminal activity) to me, I'll come see you…besides that, technically, and I mean this from my heart…but whatever I do, you get a piece of it, doesn't matter whether its legitimate, illegitimate, whatever I do." INDIVIDUAL 2 said, "Yeah that's our business…believe me, whatever I do, it goes up, and all this is, is structure…what you do (kick proceeds up the

hierarchy) I do the same thing, I do it on a weekly basis." This meeting was audio recorded by CS-1 and surveilled by case agents.

24.   On October 23, 2016, CS-1 returned a call to SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation SERVIDIO informed CS-1 that SERVIDIO had something for CS-1, but that SERVIDIO did not want to discuss it over the telephone. The two then agreed to meet in in Pleasantville, New Jersey. This conversation was not monitored or recorded, but was reported to case agents by CS-1. Analysis of call detail records confirmed it took place. Later that day, CS-1 had a meeting with SERVIDIO wherein SERVIDIO provided CS-1 with a Bayer Aspirin bottle containing 99 blue colored pills and a Samsung Galaxy S7 box. SERVIDIO told CS-1 the pills were "oxy" pills and that in the box were 19 e-cigarettes that contained marijuana. CS-1 and SERVIDIO discussed providing the items to UCE-1. This meeting was not recorded or surveilled, but was reported to case agents by CS-1. The 99 pills provided by SERVIDIO were sent to the DEA Laboratory where analysis revealed they contained heroin and fentanyl. The total net weight of the submitted pills was 9.8 grams.

25.   On October 27, 2016, CS-1 had a meeting with JOSEPH SERVIDIO in Northfield, New Jersey. During the meeting SERVIDIO informed CS-1 that SERVIDIO had spoken with INDIVIDUAL 2 earlier

in the day and INDIVIDUAL 2 had given permission, as CS-1's
capo, for SERVIDIO to work with CS-1 and INDIVIDUAL 1 with
regard to selling the heroin pills and stolen cigarettes.
SERVIDIO said, "…I told the kid (INDIVIDUAL 2) that we were
going to do something…because I don't want anybody else saying
something (about our criminal activity)." Your Affiant believes
that by INDIVIDUAL 2 ("the kid," as INDIVIDUAL 2 is considerably
younger than SERVIDIO and CS-1), as a capo in the Philadelphia
LCN, granting permission for SERVIDIO and CS-1 to conduct
criminal activity together, their efforts were "on the record"
or sanctioned by the organization. This meeting was audio
recorded by CS-1 and surveilled by case agents. Analysis of call
detail records revealed 11 text messages exchanged between a
telephone number known to be used by INDIVIDUAL 2 and SERVIDIO
PHONE 3 on this date.

26.  On October 29, 2016, CS-1 had a meeting with JOSEPH
SERVIDIO in Marmora, New Jersey. During the meeting CS-1
provided SERVIDIO with $1,655 in United States Currency, which
had been provided by the FBI, as payment for the heroin pills
and e-cigarettes alleged to contain marijuana that SERVIDIO had
provided on October 23, 2016. CS-1 and SERVIDIO also discussed
SERVIDIO's prior conversations with INDIVIDUAL 2 regarding CS-1
and SERVIDIO conducting criminal activity together. CS-1 said,
"…what did (INDIVIDUAL 2) say to you when you told him you're

going to be working with us, what did he say?" SERVIDIO said,
"No problem." CS-1 said, "Joe, is it alright with you when I see
(INDIVIDUAL 2) I bring up this same subject?" SERVIDIO said,
"Yeah, but I don't think you have to." This meeting was audio
recorded by CS-1 and surveilled by case agents.

27.   On November 10, 2016, after meeting with INDIVIDUAL 1
in Philadelphia, CS-1 and UCE-1 had a meeting with JOSEPH
SERVIDIO in Northfield, New Jersey. During the meeting SERVIDIO
and UCE-1 discussed further heroin and methamphetamine
trafficking activity. SERVIDIO said, "So what do you think, you
think we can get something going (regular supply of heroin pills
from GALLICCHIO to UCE-1) here?" UCE-1 asked if SERVIDIO wanted
UCE-1 to contact MICHAEL GALLICCHIO directly. SERVIDIO said,
"Matter of fact, next time I come down, I'll give (CS-1) a
different number for you to call him (GALLICCHIO) direct." Also
in the conversation, SERVIDIO indicated that SERVIDIO had a
buyer looking for pound quantities of methamphetamine. This
meeting was audio recorded by UCE-1, and CS-1, and surveilled by
case agents.

28.   On November 26, 2016, CS-1 placed an outgoing call to
SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH
SERVIDIO. During the call CS-1 confirmed with SERVIDIO that they
were meeting at a restaurant in Marmora, New Jersey. This
conversation was audio recorded by CS-1 and analysis of call

detail records confirmed it took place. CS-1 and UCE-1 then had

a meeting with JOSEPH SERVIDIO at a restaurant, and then at

SERVIDIO's residence in Marmora, New Jersey. During the meeting

SERVIDIO gave UCE-1 300 heroin pills. UCE-1 provided SERVIDIO

with $3,000 in United States Currency as payment for the pills.

SERVIDIO also provided UCE-1 with telephone number xxx-xxx-4628[5]

for UCE-1 to use to contact MICHAEL GALLICCHIO to obtain heroin

pills in the future. SERVIDIO said, "…yeah that's what I'm going

to do. I'm going to give him (UCE-1) the number today. So you

can call him (GALLICCHIO)…if there is any problem you can call

me." SERVIDIO then placed an outgoing call from his (SERVIDIO's)

cellular telephone (determined by the agents through toll

analysis and other information learned through the investigation

to be another cellular phone used by SERVIDIO at the time- this

call was not made on SERVIDIO PHONE 2 or SERVIDIO PHONE 3),

wherein SERVIDIO re-introduced UCE-1 to GALLICCHIO. This meeting

was audio recorded by CS-1 and UCE-1, and surveilled by case

agents. The 300 pills provided by SERVIDIO were sent to the DEA

Laboratory where analysis revealed they contained heroin and

fentanyl. The pills had a net weight of 30.5 grams.

29.  On December 2, 2016, at approximately 1:14 p.m., CS-1

placed an outgoing call to SERVIDIO PHONE 3 wherein CS-1 had a

---

[5] Telephone number xxx-xxx-4628 was subscribed to Rosa Parks, at an address in Teaneck, New
Jersey, 07666. Your Affiant believes the subscriber and address to be fictitious.

conversation with JOSEPH SERVIDIO. During the conversation CS-1 and SERVIDIO arranged to meet at a restaurant in Atlantic County, New Jersey. During the conversation SERVIDIO said, "I'll, I'll meet you at the restaurant then." This conversation was audio recorded by CS-1, and analysis of call detail records confirmed it took place. During CS-1's subsequent meeting with SERVIDIO, CS-1 provided SERVIDIO with 60 cartons of cigarettes which were purported to be stolen and supplied by UCE-1[6] (hereinafter, "stolen cigarettes"). Also during the conversation SERVIDIO discussed "making my bones" at age 19. Your Affiant knows the phrase "making bones" to signify the committing of a murder, and that SERVIDIO was claiming to have killed somebody when SERVIDIO was 19 years of age. This meeting was audio recorded by CS-1, and surveilled by case agents.

30.  On December 16, 2016, at approximately 10:07 a.m., CS-1 received an incoming call from SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation they arranged a meeting in order for SERVIDIO to provide CS-1 with proceeds from the sale of previously supplied stolen cigarettes. This conversation was not recorded or monitored but was reported to case agents by CS-1. Analysis of call detail records confirmed it took place. CS-1 and SERVIDIO then met in

---

[6] FBI Newark provided cigarettes obtained from the manufacturer which do not possess legally required tax stamps that enable them to be sold commercially.

Ventnor, New Jersey. During the meeting SERVIDIO provided CS-1 with $4,440 in United States Currency as payment for the stolen cigarettes, and they discussed plans for future transactions. SERVIDIO said, "…here it is, count it though, forty-four ($4,400)." This meeting was audio recorded by CS-1 and surveilled by case agents.

31.  On December 23, 2016, CS-1 and UCE-1 had a meeting with JOSEPH SERVIDIO and CARL CHIANESE at a Garden State Parkway rest stop in Wall, New Jersey. During the meeting SERVIDIO provided UCE-1 $2,200 in United States Currency as payment for previously supplied stolen cigarettes, and SERVIDIO asked UCE-1 for more stolen cigarettes. After UCE-1 informed SERVIDIO that UCE-1 did not currently have more stolen cigarettes to provide, SERVIDIO stated he wanted two cases of a specific brand of cigarettes every two days that were for "Arabs." SERVIDIO then retrieved a cellular phone box and handed it to UCE-1. SERVIDIO informed UCE-1 that the box contained approximately 300 heroin pills. UCE-1 then gave SERVIDIO $3,000 in United States Currency as payment for the heroin. UCE-1 then spoke to CHIANESE regarding conducting future heroin transactions. CHIANESE provided UCE-1 with telephone number xxx-xxx-0040[7] to be used to arrange future heroin transactions. Further, they discussed

---

[7] Telephone number xxx-xxx-0040 was subscribed to Carl Chianese, at an address known to be associated with him in Point Pleasant Boro, New Jersey, 08742.

coded language that was to be used during these conversations. This meeting was audio recorded by UCE-1, and surveilled by case agents. A portion of the meeting was video recorded. The 305 pills provided by SERVIDIO were sent to the DEA Laboratory where analysis revealed they contained heroin and fentanyl. The pills had a net weight of 29.0 grams.

32.  On December 29, 2016, CS-1 received an incoming call from telephone number (SERVIDIO PHONE 3, see footnote 1) wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation, SERVIDIO informed CS-1 that he was calling from his new telephone number. This conversation was not monitored or recorded, but was reported to case agents by CS-1. Analysis of call detail records confirmed it took place.

33.  On December 30, 2016, at approximately 11:02 a.m., CS-1 received an incoming call from SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation SERVIDIO and CS-1 arranged for SERVIDIO to meet with UCE-1 on the following day. CS-1 said, "So my guy (UCE-1) is just going to meet you at ten o'clock tomorrow at your house." SERVIDIO said, "Alright tell him make it eleven then, is that okay?" CS-1 was arranging for SERVIDIO to meet with UCE-1 for the purpose of discussing criminal activity including drug trafficking. This conversation was audio recorded by CS-1, and analysis of call detail records confirmed it took place.

34.  On December 31, 2016, at approximately 10:59 a.m.,
UCE-1 placed an outgoing call to SERVIDIO PHONE 3 wherein UCE-1
had a conversation with JOSEPH SERVIDIO. During the conversation
UCE-1 confirmed, per CS-1's instructions that they would meet at
SERVIDIO's residence. UCE-1 then met with SERVIDIO at SERVIDIO's
residence in Marmora, New Jersey. During the meeting, UCE-1 and
SERVIDIO discussed criminal activity conducted in the past, and
plans for possible criminal activity in the future. UCE-1
purported to know an individual that could supply stolen and/or
counterfeit goods. SERVIDIO said, "Does he got any
revolvers…like a thirty-two, thirty-eight (caliber)?" UCE-1
said, "…Just like something you put on like a foot or something
to just have?" SERVIDIO said, "Well not, not to just to have, to
use it and throw it the fuck away…don't want no cases (casings)
to come out…a revolver it's better off." Your Affiant believes
SERVIDIO was asking for a revolver, rather than a semi-
automatic, as a revolver does not eject casings when fired. Your
Affiant knows that spent casings are retained in the cylinder of
a revolver and not ejected as they are from a semi-automatic.
Your Affiant further believes that SERVIDIO's desire to not have
casings ejected along with wanting a firearm to "throw it the
fuck away" indicates he was asking for a firearm that could be
used in a shooting(s) with no ballistic evidence (in the form of
shell casings) left behind and no firearm in his possession

(thrown away). SERVIDIO also offered to supply UCE-1 with more heroin pills which could be supplied up front, with payment expected at a later date. UCE-1 then provided SERVIDIO with a quantity of stolen cigarettes. This meeting was audio recorded by UCE-1, and surveilled and photographed by case agents.

35.   On January 3, 2017, at approximately 8:38 a.m., CS-1 placed an outgoing call to SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation CS-1 confirmed with SERVIDIO that they were having a meeting at SERVIDIO's residence. This conversation was audio recorded by CS-1 and analysis of call detail records confirmed it took place. CS-1 then had a meeting with JOSEPH SERVIDIO in Marmora, New Jersey. During the meeting SERVIDIO provided CS-1 with $4,000 in United States Currency as a partial payment for previously supplied stolen cigarettes. Further, SERVIDIO informed CS-1 that CS-1's capo, INDIVIDUAL 2, owed SERVIDIO $3,500 for previously supplied marijuana. This meeting was audio recorded by CS-1.

36.   On January 8, 2017, UCE-1 received several attempted incoming calls from SERVIDIO PHONE 3. At approximately 3:47 p.m., UCE-1 placed an outgoing call to SERVIDIO PHONE 3 wherein UCE-1 had a conversation with JOSEPH SERVIDIO. During the conversation SERVIDIO requested that UCE-1 come to SERVIDIO's residence. SERVIDIO explained that he was driving a small car,

27

and therefore would not be able to take delivery of large
quantities of stolen cigarettes. This conversation was not
recorded as UCE-1 did not have recording equipment at the time
SERVIDIO initiated the contact. Later that day UCE-1 had a
meeting with SERVIDIO at SERVIDIO's residence. Also present at
the meeting were MICHAEL GALLICCHIO and CARL CHIANESE.
GALLICCHIO assisted UCE-1 in unloading a quantity of cases of
stolen cigarettes into SERVIDIO's residence. SERVIDIO then
supplied UCE-1 with 300 heroin pills. UCE-1 suggested that
SERVIDIO could take the payment for the pills out of what
SERVIDIO owed UCE-1 for the stolen cigarettes. SERVIDIO said,
"Well the pills ain't mine, they're his," and gestured towards
GALLICCHIO. GALLICCHIO then informed UCE-1 that he was willing
to wait for payment for the heroin. This meeting was audio
recorded by UCE-1, and surveilled by case agents. The 300 pills
provided by SERVIDIO (and attributed to GALLICHIO), were sent to
the DEA Laboratory where analysis revealed they contained heroin
and fentanyl. The pills had a net weight of 28.4 grams.

37.  Later on January 8, 2017, CS-1 received an incoming
telephone call from SERVIDIO PHONE 3 wherein CS-1 had a
conversation with JOSEPH SERVIDIO. During the conversation
SERVIDIO informed CS-1 that SERVIDIO had just had a meeting with
UCE-1. Your Affiant believes this call exemplifies the
organizational nature of the Philadelphia LCN, in that after

SERVIDIO met with UCE-1 to conduct criminal activity, SERVIDIO placed a call to CS-1 to acknowledge the meeting, as CS-1 was the individual who introduced UCE-1 to SERVIDIO for the purpose of conducting criminal activity together. This conversation was not monitored or recorded, but was reported to case agents by CS-1. Analysis of call detail records confirmed it took place.

38.   On January 13, 2017, at approximately 2:25 p.m., CS-1 received an incoming call from SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation SERVIDIO informed CS-1 that he was in the area and could meet with CS-1. CS-1 told SERVIDIO that CS-1 was in Philadelphia to meet with INDIVIDUAL 2 and could meet later. SERVIDIO said, "…I talked to the kid (INDIVIDUAL 2) before too, don't, don't tell him that we talked today…" CS-1 said, "Yeah I know, listen, what goes, what goes on between us stays between us brother, don't you ever worry." SERVIDIO said, "Yeah he knows, he knows a little bit, you know what I'm saying because (INDIVIDUAL 1) tells him." SERVIDIO did not want CS-1 to tell CS-1's capo, INDIVIDUAL 2, that SERVIDIO and CS-1 were talking and possibly meeting on that day. Your Affiant believes SERVIDIO did not want CS-1 to tell INDIVIDUAL 2 because SERVIDIO and CS-1 were meeting to conduct criminal activity, and SERVIDIO did not want CS-1's information regarding the activity to conflict with the information SERVIDIO had already provided to INDIVIDUAL 2. Later

that day CS-1 had a meeting with SERVIDIO in Ventnor, New Jersey. During the meeting SERVIDIO provided CS-1 with $4,500 for previously supplied stolen cigarettes. Further, they discussed SERVIDIO's ability to distribute methamphetamine and cocaine in addition to the stolen cigarettes. Also during the meeting, SERVIDIO requested to use CS-1's telephone to make a call. SERVIDIO had CS-1 dial telephone number xxx-xxx-2462[8] and SERVIDIO had a conversation with an unidentified individual regarding the price of a kilogram of cocaine. SERVIDIO said, "…I know, thirty-four ($34,000), we don't know anybody that has thirty-four sitting in that want to pay, you understand what I'm saying', I'll ask though, I'll ask around…" SERVIDIO then said to CS-1, "Alright so you hear what he said right, he's got keys (kilograms of cocaine) for thirty-four…but it's got to be cash, you know what I'm saying…" This meeting was audio recorded by CS-1. Analysis of call detail records confirmed that CS-1's telephone was used to call telephone number xxx-xxx-2462. Further, telephone number xxx-xxx-2462 attempted four unanswered calls to SERVIDIO PHONE 3 just prior to SERVIDIO placing the above mentioned call, and numerous calls with SERVIDIO PHONE 3 in November of 2016.

39.  On January 20, 2017, at approximately 3:06 p.m., UCE-1 placed an outgoing call to SERVIDIO PHONE 3 wherein UCE-1 had a

---

[8] Telephone number xxx-xxx-2462 was subscribed to Nazir William, with no address listed.

conversation with JOSEPH SERVIDIO. During the conversation they arranged to meet at SERVIDIO's residence in Marmora, New Jersey. During the conversation SERVIDIO said, "I'm sitting on the couch, so take your time…door's open." This conversation was audio recorded by UCE-1. During the subsequent meeting UCE-1 provided SERVIDIO with a quantity of stolen cigarettes, and SERVIDIO provided UCE-1 with 300 heroin pills. UCE-1 said, "Joe I was hoping to get, do you uh, we got rid of those three hundred (sold the previously supplied 300 heroin pills), do you have two hundred (more pills)?" SERVIDIO said, "I got more…I got three (hundred), you want the three, take them." SERVIDIO and UCE-1 agreed that the price of the heroin pills, $3,000, would be subtracted from the amount SERVIDIO currently owed UCE-1 for previously supplied stolen cigarettes, which stood at over $10,000. This meeting was audio recorded by UCE-1 and surveilled by case agents. The 300 pills provided by SERVIDIO were sent to the DEA Laboratory where analysis revealed they contained fentanyl. The pills had a net weight of 27.3 grams.

40.   On January 29, 2017, CS-1 had a meeting with JOSEPH SERVIDIO at SERVIDIO's residence in Marmora, New Jersey. During the meeting they discussed SERVIDIO owing money for previously supplied stolen cigarettes and SERVIDIO provided CS-1 with $3,000 in United States Currency. SERVIDIO also informed CS-1 that SERVIDIO was awaiting money that was "tied up" in a

methamphetamine transaction with CARL CHIANESE. SERVIDIO said, "Carl's (CHIANESE) a fucking liar, schemer…he's got like a half a pound a fucking meth of mine, you know." Your Affiant believes that SERVIDIO uses CHIANESE as a courier to acquire and then deliver drugs including methamphetamine, and that SERVIDIO was saying that CHIANESE had not yet delivered SERVIDIO payment from the proceeds of the sale of methamphetamine that had been arranged, and paid for, by SERVIDIO. This meeting was audio recorded by CS-1.

41.   On January 31, 2017, at approximately 7:56 p.m., CS-1 received incoming call from SERVIDIO PHONE 2 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation SERVIDIO requested to meet with CS-1 to provide proceeds from the sale of stolen cigarettes previously supplied by UCE-1. Further, SERVIDIO wanted to "settle up" with CS-1 because SERVIDIO believed something was going to happen to SERVIDIO. CS-1 informed SERVIDIO that CS-1 was not in a position to meet with SERVIDIO at the time, and the call was ended. CS-1 placed an outgoing call back to SERVIDIO PHONE 2 wherein CS-1 had another conversation with SERVIDIO. CS-1 asked SERVIDIO if he was alright, and SERVIDIO advised CS-1 that he (SERVIDIO) was alright, and that they would meet the following day. After the conclusion of the call, CS-1 sent a text message to SERVIDIO PHONE 2 assuring SERVIDIO that CS-1 was there for SERVIDIO if he

needed CS-1. These conversations were not monitored or recorded, but were reported to case agents by CS-1. Analysis of call detail records confirmed the calls and text message took place.

42.   On February 1, 2017, at approximately 1:00 p.m., CS-1 had a meeting with JOSEPH SERVIDIO in Ventnor, New Jersey. During the meeting SERVIDIO requested CS-1's assistance in counting a large quantity of United States Currency, which SERVIDIO later informed CS-1 consisted of the proceeds of a robbery.  After counting the cash and placing it numerous envelopes, SERVIDIO provided CS-1 approximately $7,560 to give to UCE-1 for previously supplied stolen cigarettes. INDIVIDUAL 1 and CARL CHIANESE later joined the meeting, and CS-1 observed SERVIDIO supplying INDIVIDUAL 1 and then CHIANESE with envelopes that contained unknown amounts of cash. This meeting was not recorded due to a malfunction of the recording equipment, but was reported to case agents. Analysis of call detail records confirmed calls and text messages exchanged between a telephone number known to be used by CHIANESE and SERVIDIO PHONE 2, and calls exchanged between a telephone number known to be used by INDIVIDUAL 1 and SERVIDIO PHONE 2 and SERVIDIO PHONE 3, prior to the meeting described by CS-1.

43.   On February 9, 2017, CS-1 had a meeting with JOSEPH SERVIDIO at SERVIDIO's residence in Marmora, New Jersey. During the meeting they discussed stolen cigarette transactions. In

33

fact, CS-1 told SERVIDIO that the cigarettes that had been provided by UCE-1 had been stolen, and that was how UCE-1 acquired them. SERVIDIO said, "I told you before, God forbid the Feds (federal law enforcement) come here because of what I did, I don't want to get caught with all this shit here. But I'll get it out." Further, they had a conversation regarding MICHAEL GALLICCHIO's heroin pills, and UCE-1's complaint regarding the low quality. SERVIDIO said, "I told him (GALLICCHIO) you got to come down this weekend, either bring three hundred good ones (heroin pills) or give him (UCE-1) his fucking money back." SERVIDIO also stated that GALLICCHIO "makes" the pills and that the low quality was likely due to the "product" that GALLICHIO bought from "the guy." Later in the meeting CS-1 discussed different ways to make money through criminal activity. During the course of this discussion between CS-1 and SERVIDIO, SERVIDIO made the following statement: … "eighty percent of eyewitnesses got the wrong person, eighty percent, they, they look like the person…so without any other corroborating evidence, you know what I mean, you can even beat that, you know, the things you can't beat are the tapes (audio recordings) with you saying it, that's what you did, you know." SERVIDIO went on to discuss not talking about criminal activity with or around certain people. This meeting was audio recorded by CS-1 and surveilled by case agents.

44.   On February 17, 2017, CS-1 and UCE-1 attended a meeting in a restaurant in Atlantic County, New Jersey, with several members and associates of the Philadelphia LCN, including JOSEPH SERVIDIO, INDIVIDUAL 1, CARL CHIANESE, and INDIVIDUAL 3. During the meeting UCE-1 had a private conversation with SERVIDIO wherein SERVIDIO provided UCE-1 with $6,500 in United States Currency as payment for previously supplied stolen cigarettes. Further, SERVIDIO explained to UCE-1 that MICHAEL GALLICCHIO had advised SERVIDIO that the heroin pills most recently supplied were being reported to be of low quality. SERVIDIO said, "…whatever went bad with that, Michael (GALLICCHIO) is going to come down. If you tell me, 'Joe I lost one-hundred-and-fifty of them,' you got it. If you tell me you lost the whole three-hundred (300 previously supplied heroin pills), you didn't get paid for any of them, he'll give the whole three hundred." They then discussed that UCE-1 was not going to be in the area for long. SERVIDIO said, "I'll make Carl (CHIANESE) run up (to Northern New Jersey) and get them." This meeting was audio recorded by UCE-1. Also during this meeting, an associate of the Philadelphia LCN in attendance informed CS-1 that an individual in the restaurant was an FBI agent. (While case agents were conducting surveillance of this meeting, no FBI agents were in the restaurant at the time). Your Affiant believes, based on a review of the recording of this meeting

made by CS-1 that a retired FBI agent may have been in the
restaurant, and was recognized by the attendees. Your Affiant
knows that members of the Philadelphia LCN have on several
occasions correctly identified, including to CS-1, members of
FBI surveillance teams. Further, members and associates,
including SERVIDIO, have been recorded talking about not
discussing criminal activity in public in an effort to not be
overheard or recorded by law enforcement.

45.   On February 24, 2017, CS-1 had a meeting with JOSEPH
SERVIDIO in Northfield, New Jersey. During the meeting SERVIDIO
provided CS-1 with 300 pills which were to be given to UCE-1.
SERVIDIO explained that 100 pills were "free" and 200 were for
sale if UCE-1 was interested (case agents determined that
SERVIDIO actually provided 301 pills). CS-1 and SERVIDIO also
discussed CS-1 meeting with INDIVIDUAL 2 regarding CS-1's drug
trafficking activity with SERVIDIO. SERVIDIO said, "He
(INDIVIDUAL 2) probably wants it to go through him…there could
be some (money) for everybody, but everybody's got to get some."
SERVIDIO was speculating that INDIVIDUAL 2 would likely want to
be made aware of all criminal activity in order to receive his
portion of the proceeds ("everybody's got to get some"). This
meeting was audio recorded by CS-1 and surveilled by case
agents. The 301 pills provided by SERVIDIO were sent to the DEA

Laboratory where analysis revealed they contained Tramadol, a controlled substance. The pills had a net weight of 28.0 grams.

46.  On February 25, 2017, at approximately 7:17 p.m., UCE-1 placed an outgoing call to SERVIDIO PHONE 3 wherein UCE-1 had a conversation with JOSEPH SERVIDIO. During the conversation UCE-1 and SERVIDIO discussed the heroin pills SERVIDIO provided to CS-1 to be given to UCE-1. UCE-1 said, "…I got the pills, I appreciate it…I just want to touch base on the price of the cigarettes…" UCE-1 was attempting to engage SERVIDIO in a conversation regarding the expected payment. SERVIDIO interrupted UCE-1 and said, "I know, the thing is this is my only phone, this is my regular phone." UCE-1 said, "Oh yeah sure…" SERVIDIO said, "…that's why I don't want to talk to nobody, that's why I say call other people, or just call me I'll meet you down there…" SERVIDIO was telling UCE-1 that he did not want to discuss criminal matters directly over the telephone. Your Affiant knows that throughout the investigation, as confirmed in this conversation, SERVIDIO has conducted many discussions regarding criminal activity in person, using the telephone merely to arrange the meetings ("just call me I'll meet you…") and for general statements of the reasons for the meetings. However, your Affiant is also aware that on occasion SERVIDIO has in fact discussed, in coded language, specific details regarding criminal activity with other members and

37

associates of the Philadelphia LCN, including doing so on other
people's phones. This conversation was audio recorded by UCE-1.

47.  On February 27, 2017, CS-1 placed an outgoing call to
SERVIDIO PHONE 2 wherein CS-1 had a conversation with JOSEPH
SERVIDIO. During the conversation they agreed to meet in
Ventnor, New Jersey. This conversation was not monitored or
recorded, but was reported to case agents by CS-1. Analysis of
call detail records confirmed one call and five text messages
between a telephone number used by CS-1 and SERVIDIO PHONE 2 on
this date. Later that day CS-1 had a meeting with SERVIDIO in
Ventnor, New Jersey. During the meeting, at the direction of
case agents, CS-1 attempted to assuage SERVIDIO's stated
concerns regarding continuing criminal activity with UCE-1.
SERVIDIO was concerned that UCE-1 was talking openly in
telephone calls, rather than using coded language. After
SERVIDIO assured CS-1 that based on CS-1's relationship with
UCE-1, SERVIDIO would continue to conduct criminal activity with
UCE-1, SERVIDIO said, "…and we are fucking manufacturing. You
know what the fuck time (incarceration) we're going to get for
that? For something stupid." SERVIDIO was referring to the fact
that SERVIDIO and GALLICCHIO were not just purchasing heroin
pills and selling them for profit, but that they were
manufacturing the pills, which SERVIDIO believed would result in
a longer sentence ("time") if they were to be convicted. This

meeting was audio recorded by CS-1 and surveilled by case agents.

48. On March 11, 2017, at approximately 10:37 a.m., CS-1 placed an outgoing call to SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation CS-1 invited SERVIDIO to a meeting at a restaurant in Atlantic County, New Jersey. This conversation was audio recorded by CS-1 and analysis of call detail records confirmed it took place. CS-1 then had a meeting with several members and associates of the Philadelphia LCN, including JOSEPH SERVIDIO, INDIVIDUAL 3, and others. During the meeting, they discussed FBI surveillance of a Philadelphia LCN member (SERVIDIO and INDIVIDUAL 3 were not believed to be present during the portion of the meeting where the FBI was discussed). Later in the conversation, CS-1, INDIVIDUAL 3 and SERVIDIO discussed INDIVIDUAL 3 selling heroin pills. CS-1 said, "I don't want you (INDIVIDUAL 3) doing anything unless the cash is there...'cause ultimately I'm responsible, you're with me (associated with CS-1 in the Philadelphia LCN)." INDIVIDUAL 3 said, "I got to know the figures (prices)...let's say I need fifty (pills)." SERVIDIO said, "Ten dollars." SERVIDIO was saying the price per pill for INDIVIDUAL 3 would be $10. INDIVIDUAL 3 said, "That's what I got to pay. What numbers (size of pill) are they?" SERVIDIO said, "They're thirties (30 milligrams), they're selling them for

sixteen to thirty dollars (per pill)." INDIVIDUAL 3 said, "For a hundred dollars, I get ten (pills)." SERVIDIO said, "But Carl's (CHIANESE) not gonna drive down for ten though." Your Affiant knows that SERVIDIO uses CHIANESE as a courier to transport drugs and collect and deliver proceeds from the sale of drugs. SERVIDIO then suggested that INDIVIDUAL 3 order 100 pills for $1,000. This meeting was audio recorded by CS-1.

    49.   On April 2, 2017, UCE-1 and CS-1 had a meeting with JOSEPH SERVIDIO and INDIVIDUAL 3 in Northfield, New Jersey. During the meeting UCE-1, CS-1 and SERVIDIO left INDIVIDUAL 3 and had a private conversation. During that conversation they discussed SERVIDIO possibly supplying methamphetamine to UCE-1. SERVIDIO said, "What kind of money can you get for a pound (of methamphetamine)?" UCE-1 told SERVIDIO that he would talk to him at a later date after UCE-1 spoke with a purported methamphetamine customer. UCE-1 said, "I could use some of that other stuff (heroin pills) though, that you've been getting from Mike (GALLICCHIO)." SERVIDIO said, "That (heroin pills) I got at the house…" UCE-1 and SERVIDIO then made plans to meet later in the week to further discuss the drug trafficking. SERVIDIO informed UCE-1 not to call SERVIDIO, but rather to send a text message with the letters "ETA" and then the time of UCE-1's estimated time of arrival when meeting to conduct criminal

activity. This meeting was audio recorded by UCE-1 and CS-1, and surveilled by case agents.

50.  On April 7, 2017, at approximately 10:10 a.m., UCE-1 sent a text message to SERVIDIO PHONE 3 that read, [Eta 1145-12]. At approximately 10:21 a.m., UCE-1 received an incoming text message from SERVIDIO PHONE 3 that read, [K here]. UCE-1 subsequently had a meeting with JOSEPH SERVIDIO at SERVIDIO's residence in Marmora, New Jersey. During the meeting they discussed future stolen cigarette transactions, and UCE-1 purchasing more heroin pills. SERVIDIO also informed UCE-1 that SERVIDIO could supply methamphetamine. SERVIDIO said, "…meth, I can get you that. I can get you anything you want…its ice, it's all crystal (crystal methamphetamine)." SERVIDIO stated that CARL CHIANESE was "sitting on" four ounces of "crystal meth," and that the price for the methamphetamine would be $4,500. While discussing the future drug transaction, SERVIDIO instructed UCE-1 on how to send a coded text message regarding confirmation of future drug transactions. SERVIDIO said, "All you do is when you're coming in (to meet with SERVIDIO) right, you say I'll be here at five after four, that means you want five (ounces of methamphetamine)". This meeting was audio recorded by UCE-1 and surveilled by case agents. Shortly after departing the residence, at approximately 12:04 p.m., UCE-1 sent a text message to SERVIDIO PHONE 3 that read, [Does 904 this

Sunday morning work]. Based on the code provided above by
SERVIDIO, UCE-1 was communicating that UCE-1 was interested in
purchasing the four ounces of methamphetamine on Sunday morning
at 9:00 a.m. At approximately 12:05 p.m., UCE-1 received an
incoming text message form SERVIDIO PHONE 3 that read, [Yes].[9]
Your Affiant believes that SERVIDIO wants to use coded language
with UCE-1 when referring to drug transactions in an effort to
thwart law enforcement efforts at electronic surveillance.

    51.  On April 9, 2017, at approximately 9:08 a.m., UCE-1
sent a text message to SERVIDIO PHONE 3 that read, [ETA 9],
indicating that UCE-1 had an estimated time of arrival at
SERVIDIO's residence of 9:00 a.m. At approximately 9:08 a.m.,
UCE-1 received an incoming text message form SERVIDIO PHONE 3
that read, [K here]. A short time later UCE-1 met with SERVIDIO
at SERVIDIO's residence in Marmora, New Jersey. During the
meeting SERVIDIO handed UCE-1 a metal box with a plastic bag
inside containing a white crystalline substance purported to be
"crystal meth." SERVIDIO informed UCE-1 that no payment was
expected as SERVIDIO still owed UCE-1 money from previously
supplied stolen cigarettes. UCE-1 informed SERVIDIO that UCE-1
preferred to keep the transactions separate. SERVIDIO agreed,
and UCE-1 provided SERVIDIO $4,500 for the methamphetamine. This

---

[9] Throughout the investigation text messages sent and received on UCE-1's cellular telephone were
photographed and preserved as evidence.

meeting was audio recorded by UCE-1, and surveilled by case agents. The crystalline substance provided by SERVIDIO was sent to the DEA Laboratory where analysis revealed it contained no controlled substance.

52.  On April 20, 2017, at approximately 10:03 p.m., UCE-1 sent an outgoing text message to SERVIDIO PHONE 3 that read, [Sunday morni g ETA 9-930 does that work?]. At approximately 10:14 p.m., UCE-1 received an incoming text message from SERVIDIO PHONE 3 that read, [Yes]. On April 23, 2017, approximately 8:45 a.m., UCE-1 sent an outgoing text message to SERVIDIO PHONE 3 that read, [Eta 915]. At approximately 8:46 a.m., UCE-1 received an incoming text message from SERVIDIO PHONE 3 that read, [K I'm here resting]. CS-1 and UCE-1 then met with JOSEPH SERVIDIO in Marmora, New Jersey. After traveling to a restaurant, UCE-1 advised SERVIDIO that the purported methamphetamine that SERVIDIO recently supplied might be bad. SERVIDIO instructed UCE-1 to return the methamphetamine. CS-1, UCE-1 and SERVIDIO then returned to SERVIDIO's residence and a short time later were joined by CARL CHIANESE. While in the back yard of the residence SERVIDIO asked CHIANESE regarding the recent supply of methamphetamine. CHIANESE confirmed to SERVIDIO in front of UCE-1 that some of the methamphetamine was being returned. SERVIDIO instructed UCE-1 to return the bad

methamphetamine. These meetings were audio recorded by CS-1 and UCE-1 and surveilled by case agents.

53.    On April 21, 2017, CS-1 had a meeting with several Philadelphia LCN members and associates including JOSEPH SERVIDIO and INDIVIDUAL 3 in Margate, New Jersey. During the meeting SERVIDIO explained to CS-1 that SERVIDIO's friend's son had died as a result of a drug overdose. SERVIDIO said, "…his wife, when I talked to her, she said, 'you're the only person, that ever sold drugs that I love, I despise people because my son OD'd'…she said, 'Joe please stop what you're doing (selling drugs), you hurt people, people like you hurt people.'" CS-1 said, "You think she's right?" SERVIDIO said, "Yes." CS-1 said, "What's wrong with us?"  SERVIDIO said, "It's the most money I can make (selling drugs), I like to spend money…" This meeting was audio recorded by CS-1.

54.    On May 13, 2017, at approximately 2:20 p.m., UCE-1 sent a text message to SERVIDIO PHONE 3 that read, [Sorry Joe my bad I have to make a run tomorrow. Can you meet up at 8AM]. Approximately one minute later UCE-1 received an incoming text message from SERVIDIO PHONE 3 that read, [Yes for sure 8am tmrw morning]. UCE-1 was arranging a meeting with JOSEPH SERVIDIO in order to return the previously supplied crystal substance that was purported to be methamphetamine.

55.  On May 14, 2017, at approximately 8:02 a.m., UCE-1
placed an outgoing call to SERVIDIO PHONE 3 wherein UCE-1 had a
conversation with JOSEPH SERVIDIO. During the conversation
SERVIDIO said, "Come on over." UCE-1 said, "Alright, we'll be
there in ten minutes." This conversation was audio recorded by
UCE-1. CS-1 and UCE-1 then met with SERVIDIO at SERVIDIO's
residence in Marmora, New Jersey. During the meeting UCE-1
provided SERVIDIO with the previously supplied methamphetamine,
which did not test positive for the presence of a controlled
substance. SERVIDIO said, "…I gave them thirty-two thousand
($32,000) to get me fucking meth, and the deal went bad." UCE-1
said, "So how's that going, 'cause I brought, I brought the rest
of it (sham methamphetamine) back." SERVIDIO said, "Yeah, I'll
get that back for you, yeah that (the previous methamphetamine)
came from somebody else." Your Affiant believes SERVIDIO was
saying that he had problems ("the deal went bad") with a new
methamphetamine supplier ("somebody else") as well as his
original supplier. As they discussed the previously supplied
heroin pills, SERVIDIO said, "…it's like every fourth to fifth
batch, he (GALLICCHIO) has a problem because, he doesn't do it,
and the people that sell him the heroin to put it in, it's a
little weaker." SERVIDIO then provided UCE-1 with 302 pills,
which were provided in two plastic bags, one containing 200
pills stamped "A/215" and one containing 102 pills stamped

"K/9"[10]. This meeting was audio recorded by CS-1 and UCE-1, and surveilled by case agents. The 302 pills provided by SERVIDIO were sent to the DEA Laboratory where analysis revealed the 200 pills stamped "A/215" contained methamphetamine and heroin (net weight 18.3 grams), and the 102 pills stamped "K/9" contained tramadol, which is also a controlled substance (net weight 9.6 grams).

56.   On May 21, 2017, at approximately 3:42 p.m., CS-1 placed an outgoing call to SERVIDIO PHONE 3 wherein CS-1 had a conversation with JOSEPH SERVIDIO. During the conversation CS-1 asked if SERVIDIO was going to be at his residence, or if he was going to go out. SERVIDIO said, "…Michael (GALLICCHIO) and Carl (CHIANESE) are coming to my house, but they don't want to go out, so I'm going to stay at my house for a couple of hours with them, and then I'm going out." CS-1 said, "Alright, um, what's your plans for tomorrow?" CS-1 and SERVIDIO then agreed to meet the following morning. The conversation was audio recorded by CS-1. Analysis of call detail records revealed 3 calls between a telephone number known to be used by CARL CHIANESE and SERVIDIO PHONE 3 on this date, and no calls between any number known to be used by GALLICCHIO and SERVIDIO PHONE 3 or SERVIDIO PHONE 2.

---

[10] Your Affiant knows that "A/215" and "K/9" are two common stamps found on commercially available 30 milligram Oxycodone pills.

57.   On June 1, 2017, at approximately 7:45 a.m., CS-1
received an incoming text message from SERVIDIO PHONE 2 that
read, [Lost iPhone last nite call on this #]. Through a series
of subsequent communications SERVIDIO explained that he lost
SERVIDIO PHONE 3 and would need to be contacted on SERVIDIO
PHONE 2. CS-1 then had a meeting with SERVIDIO in Marmora, New
Jersey. During the meeting CS-1 and SERVIDIO discussed money
SERVIDIO owed to UCE-1 for previously supplied stolen
cigarettes. They also discussed SERVIDIO's problems dealing with
supplying INDIVIDUAL 3 with heroin pills. SERVIDIO, complaining
about INDIVIDUAL 3 to CS-1, said, "You (INDIVIDUAL 3) told me
you wanted to come down to my house…so Michael (GALLICCHIO) gets
there…get three hundred more (heroin pills)…everyone needs their
money." SERVIDIO further explained to CS-1 that INDIVIDUAL 3 had
ordered heroin pills, but did not show up to SERVIDIO's
residence when GALLICCHIO came to supply them. This meeting was
audio recorded by CS-1 and surveilled by case agents.

58.   On June 1, 2017, at approximately 1:55 p.m., CS-1
placed an outgoing call to SERVIDIO PHONE 2 wherein CS-1 had a
conversation with JOSEPH SERVIDIO. During the conversation CS-1
informed SERVIDIO that INDIVIDUAL 1 wanted to speak with
SERVIDIO and CS-1 was asking for permission to provide the
telephone number for SERVIDIO PHONE 2 to INDIVIDUAL 1.  SERVIDIO
gave permission to provide the telephone number to INDIVIDUAL 1

and said, "…ninety percent of the people don't have this number
(SERVIDIO PHONE 2)…" Your Affiant knows that SERVIDIO had
misplaced SERVIDIO PHONE 3 and was using SERVIDIO PHONE 2
exclusively. Further, based on analysis of call detail records,
your Affiant knows that SERVIDIO has continued to use SERVIDIO
PHONE 2 in conjunction with SERVIDIO PHONE 3 with certain
individuals.

59.  On June 10, 2017, at approximately 4:28 p.m., UCE-1
sent a text message to SERVIDIO PHONE 3 that read, [Still good
for about 6 tomorrow?]. Less than one minute later UCE-1
received an incoming text message from SERVIDIO PHONE 3 that
read, [Yes I'm gd now or whatever]. SERVIDIO was telling UCE-1
that he was ready to meet for the purpose of discussing or
conducting drug trafficking. On June 11, 2017, at approximately
4:53 p.m., UCE-1 again sent a text message to SERVIDIO PHONE 3
indicating that UCE-1 was en route to SERVIDIO's residence. At
approximately 4:54 p.m., UCE-1 received an incoming text message
that read, [Whatever I'm here]. UCE-1 and CS-1 then had a
meeting with JOSEPH SERVIDIO at SERVIDIO's residence in Marmora,
New Jersey. During the meeting SERVIDIO provided UCE-1 with two
packages of a crystal substance purported to be methamphetamine.
SERVIDIO said, "This mother fucker (methamphetamine supplier)
wouldn't give it to us. I had to fucking buy 'em, so I bought, I
bought two the other day, and I bought two yesterday…alright, so

there's four (ounces of methamphetamine) there." SERVIDIO was
telling UCE-1 that the methamphetamine supplier would not
provide the drugs up front, and therefore SERVIDIO had to "buy"
the drugs by paying for them on delivery. Your Affiant knows
SERVIDIO was alleging that the methamphetamine came from a new
supplier, due to SERVIDIO's problems with the previous supplier.
UCE-1 said, "Yeah. Are you sorted out with this guy (previous
methamphetamine supplier), or is he still kinda, I remember you
had a problem with that, with that guy…" SERVIDIO said, "Yeah
this is different, from somebody else…" SERVIDIO then discussed
the problems he had with CARL CHIANESE and returning the sham
methamphetamine. SERVIDIO said, "I said, 'Carl (CHIANESE)
listen, it's your fuckin' fault, you should pay the fuckin'
money to go buy them (the new supply of four ounces of
methamphetamine)'…" SERVIDIO went on to discuss that CHIANESE,
who had acted as SERVIDIO's courier and had dealt directly with
the methamphetamine supplier when they received the sham drugs,
should be the one to pay up front for the current supply. The
crystal substance received from SERVIDIO field tested positive
for the presence of methamphetamine, and was sent to the DEA
Laboratory for further analysis. The analysis by a DEA forensic
chemist established that the submitted substance was
methamphetamine, with a net weight of 108.7 grams and a purity
of 96%.

60.   On July 6, 2017, CS-1 conducted a consensually recorded meeting with JOSEPH SERVIDIO. During the meeting SERVIDIO stated that he and CARL CHIANESE intended to shoot a Philadelphia LCN drug trafficking associate (Individual 3) whom SERVIDIO suspected of talking openly and disparagingly about SERVIDIO's criminal activity[11]. After informing CS-1 that he and CHIANESE had at one point waited outside the intended victim's residence for three hours, and that his intention had been to conduct the shooting inside the residence when the victim was alone, SERVIDIO said, "…Me and Carl got two phones, just (exclusively) for this, you know…the thing is everything is away, I've been leaving my phones (SERVIDIO PHONE 2 and SERVIDIO PHONE 3) home, I made him (CHIANESE) leave his EZPass home, we paid cash, you know." Subsequent investigation confirmed that SERVIDIO is currently using at least three cellular telephones, and that CHIANESE is using at least two cellular telephones ("Me and Carl got two phones"), to communicate with one another regarding their criminal activity. Your Affiant believes that SERVIDIO was informing CS-1 that by leaving his other cellular telephones (which are subscribed in SERVIDIO's true name) home, and by using cash instead of EZPass, law enforcement could not

---

[11] After learning of SERVIDIO's stated intentions, the assigned FBI Agents and other law enforcement worked on a plan to secure the intended victim's safety while not jeopardizing the covert nature of the investigation. As a result of these efforts, the intended victim was not harmed.

use electronic surveillance to track their location or to place those devices in the area of the residence of the intended victim.

61.  On July 18, 2017, CS-2 had a consensually recorded meeting with JOSEPH SERVIDIO at SERVIDIO's residence. During the meeting SERVIDIO provided CS-2 approximately nine ounces of methamphetamine. SERVIDIO instructed CS-2 to attempt to sell the methamphetamine and to provide the proceeds or the remaining methamphetamine back to SERVIDIO. The substance provided to CS-2 field tested positive for the presence of methamphetamine, and agents sent the substance to the DEA Laboratory for further analysis.

62.  On July 21, 2017, UCE-1 met with JOSEPH SERVIDIO at SERVIDIO's residence. During the meeting SERVIDIO provided UCE-1 with approximately 87 blue-colored pills designed to look like Oxycodone (throughout the investigation numerous controlled drug buys of pills from SERVIDIO have revealed the pills to contain at times heroin, fentanyl, methamphetamine, other controlled substances, or no drugs at all). SERVIDIO also gave permission for UCE-1 to deal directly with MICHAEL GALLICCHIO for further purchases of pills. At approximately 12:35 p.m., an outgoing call was made from SERVIDIO PHONE 3 to telephone number xxx-xxx-4577 wherein SERVIDIO had a conversation with GALLICCHIO. During the conversation SERVIDIO said, "A friend (UCE-1) came down

today you know…but he wasn't ready (didn't have money yet) so
I'm gonna give him your number alright?" GALLICCHIO said, "Okay
yes." SERVIDIO said, "And his (telephone) number is gonna start
with a seven-oh-three, I'm gonna send to you, and then you call
him from the phone that you want to call him from, call him
today so he has the number and then he's gonna call you when
he's around…" GALLICCHIO said, "Alright no problem." SERVIDIO
said, "…Then this way he'll call and he'll meet you half way
like you know, like kinda like where you meet the other guy
from… listen you're gonna do three jobs (300 pills) at once this
way you're ready when he calls alright, this way he just calls
you to meet you, and you'll know, alright, alright." GALLICCHIO
said, "…no problem, not a problem, yeah..." Your Affiant
believes that SERVIDIO was telling GALLICCHIO that he could meet
UCE-1 at the same location GALLICCHIO meets another drug
customer ("where you meet the other guy") with whom SERVIDIO had
also made arrangements.

63.    On July 26, 2017 CS-1 had a consensually recorded
meeting with JOSEPH SERVIDIO and Individual 4. During the
meeting SERVIDIO explained that while he maintains a business,
it is not profitable. SERVIDIO said, "…we need something
(income) legitimate, I'm a criminal, everything I do is
criminal, I got to get out of it…I need like two-hundred fifty
thousand ($250,000) a year, or two, to break even. That's what I

need. So I got to do other (criminal) things, 'cause I don't make enough money. Ninety percent of my (remodeling/renovation) work is for friends and family, for free…I laugh, what did I tell you, why do I keep my company going? 'Cause I got to put the cash (from criminal activity) somewhere. I have to show it (income). How am I paying the mortgage, how am I paying my car payment, how am I paying my insurance, how am I paying my business insurance, how am I paying all these other bills…last year I robbed an armored car to break even[12]. What am I gonna do this year…" SERVIDIO then discussed starting, or funding, legitimate businesses in the Atlantic City area, and said, "…we don't want, we're not looking to take over the whole town, people don't know, need to know who the fuck we are (Philadelphia LCN), only if they give us a hard time, then we tell them who we are, we push our chest out." Later in the conversation SERVIDIO said, "(Individual 4), there's nothing better than making money. I make money every day, illegally. I don't want to do this shit."

64.   On August 15, 2017, UCE-1 met with Michael GALLICCHIO at a rest stop near mile marker 100 on the Garden State Parkway. Prior to the meeting, UCE-1 spoke with GALLICCHIO through calls and text messages to coordinate the meeting location and time.

---

[12] Case Agents are unaware of an armored car robbery in which SERVIDIO is suspected.

The purpose of the meeting was for UCE-1 to purchase additional heroin pills from Michael GALLICCHIO. When UCE-1 arrived at the meeting location with UCE-2, GALLICCHIO was already at the meeting location. GALLICCHIO exited his vehicle and walked over to the UCE's vehicle. After a brief conversation, GALLICCHIO asked UCE-1 if he could do anything with "dope." (Dope is generally a reference to heroin). UCE-1 gave a noncommittal answer. GALLICCHIO explained to UCE-1 that he could not use the dope to make the heroin pills because the color would be wrong. After this conversation, UCE-1 introduced GALLICCHIO to UCE-2 who had remained in UCE-1's vehicle. GALLICCHIO then entered UCE-1's vehicle and sat in the rear seat of the vehicle on the passenger side. GALLICCHIO handed UCE-1 a clear plastic zip lock bag containing three smaller zip lock bags with 300 blue colored pills. GALLICCHIO also provided a separate clear plastic bag with a soft brown substance, which was about the size of a postage stamp and approximately 1mm thick. GALLICCHIO characterized the substance as "dope," which UCE-1 believed to be a reference to heroin. GALLICCHIO gestured with his hands and indicated that he had a larger amount of heroin in a rectangular shape and whispered the word "kilo," almost inaudibly. UCE-1 understood the word "kilo" and GALLICCHIO's hand gesture (his fingers were curled in the shape of a rectangle) to mean that GALLICCHIO was telling UCE-1 that he was in possession of a

kilogram of the brown substance he provided as a sample to UCE-1. GALLICCHIO originally said that the "dope" (heroin) would cost $65 per gram. However after UCE-1 departed the meeting, GALLICCHIO called UCE-1 and advised him that the dope would be $55 per gram.  This undercover meeting and the phone calls and text messages that proceeded the meeting were recorded by UCE-1 and other FBI agents and have been maintained as evidence in the case. The meeting was also surveilled by FBI surveillance agents who observed GALLICCHIO meet with UCE-1 and UCE-2 in UCE-1's vehicle. The pills purchased and the sample of brown powder provided to UCE-1 by GALLICCHIO were submitted to the DEA Northeast Regional Lab for analysis. The results of the testing determined that the 300 pills purchased by UCE-1 from GALACCHIO had a net weight of 33.7 grams and contained fentanyl. The sample of brown powder submitted a net weight of approximately 2.1 grams and contained heroin and tramadol, both opioids and controlled substances.

66.  On August 4, 2017, CS-2 consensually recorded a meeting with CARL CHIANESE. During the meeting CHIANESE explained that "Mike" recently re-supplied CHIANESE with pills. CHIANESE said, "I'm gonna tell you something, they're (pills) strong as can be, I'm scared, I really am." CS-2 said, "They're strong this time?" CHIANESE said, "So now he (MICHAEL GALLICCHIO) went out and got good stuff, and he's making them

strong, but now it's costing him money." CS-2 said, "So he wants more than ten ($10 per pill)?" CHIANESE said, "No he wants ten, because he's got to get ten." Later in the conversation CS-2 and CHIANESE discussed SERVIDIO's anger with CS-2 and others over previous drug transactions in which SERVIDIO lost money due to the poor quality of the drugs supplied. CHIANESE said, "But he's (SERVIDIO) got to stick his two cents into everything, He just, if he leaves people alone, we make money, but he's got to yell, he's go to stick his two cents in, and, he forgets what phone he's on." Your Affiant believes CHIANESE was saying that when SERVIDIO gets angry and starts yelling, he talks more openly regarding criminal activity on phones that are subscribed in his name ("he forgets what phone he's on"), rather than discussing those matters on SERVIDIO PHONE 4, which your Affiant believes SERVIDIO uses exclusively for discussing criminal activity.

67.   On August 18, 2017, CS-2 consensually recorded a meeting with CARL CHIANESE. During the meeting CHIANESE described the machine and process in which MICHAEL GALLICCHIO was manufacturing pills that appeared like commercially available Oxycodone. CHIANESE then provided CS-2 with a piece of paper with the telephone number for CHIANESE PHONE 4 written on it. CHIANESE said, "That's the new number…nobody else." CS-2 said, "This is your new office number?" CHIANESE said, "This is my new office." Throughout the investigation CHIANESE and

SERVIDIO have referred to "office" telephones when they want to discuss details of criminal activity. While CHIANESE communicates with JOSEPH SERVIDIO over CHIANESE PHONE 1 and CHIANESE PHONE 3, your Affiant believes he reserved CHIANESE PHONE 2, and now CHIANESE PHONE 4, for communications with other co-conspirators, and that CHIANESE does this in an effort to limit law enforcement's ability to gather evidence through electronic surveillance. Analysis of data received from a pen-trap device confirmed that the last outgoing communication for CHIANESE PHONE 2 ceased on August 18, 2017. Your Affiant believes that CHIANESE replaced CHIANESE PHONE 2 with the CHIANESE PHONE 4, which began service on August 18, 2017.

68. On September 22, 2017, at approximately 7:23 a.m., UCE-1 sent a text message to SERVIDIO Phone 3 requesting a meeting with Joseph SERVIDIO on Monday, September 25, 2017 at 8:00 a.m. In a series of subsequent text messages, SERVIDIO agreed to meet UCE-1 at SERVIDIO'S residence. UCE-1's intent was to discuss ongoing criminal activity with SERVIDIO in person. On Monday, September 25, 2017, at approximately 9:25 a.m., UCE-1 met with SERVIDIO at his residence. SERVIDIO presented UCE-1 with what was purported to be eight ounces of methamphetamine. After a discussion with SERVIDIO, UCE-1 determined that SERVIDIO had misunderstood UCE-1's coded text message which requested that he meet SERVIDIO at 8:00 a.m. to signify that UCE-1 was requesting

to purchase eight ounces of crystal methamphetamine, based on a code previously provided by SERVIDIO wherein UCE-1 would text the time of the meeting to indicate amount of the drugs requested for purchase). UCE-1 then informed SERVIDIO that he did not actually intend to order eight ounces of methamphetamine and was attempting to inform SERVIDIO that he wanted to meet at 8:00 a.m. UCE-1 then agreed to take two ounces of the methamphetamine which SERVIDIO and UCE-1 agreed would be paid for at a later date.  The substance provided by SERVIDIO to UCE-1 was field tested by FBI agents and determined to be positive for the presence of methamphetamine. The sample was then placed in evidence as a drug exhibit and submitted to the DEA Northeast Regional Laboratory for analysis. The results of the testing by a DEA Chemist established that the submitted substance was methamphetamine, with a net weight of 55.8 grams and a purity of 97%.

69. On October 15, 2017, UCE-1 met with Joe SERVIDIO at SERVIDIO's residence at 716 U.S. Route 9, Marmora, New Jersey at approximately 4:42 p.m. After a brief greeting, SERVIDIO went into the kitchen and removed a plastic bag from a drawer in the kitchen. In the plastic bag was hard brown substance that was supposed to be a sample of heroin. SERVIDIO provided the plastic bag with the brown substance to UCE-1 and asked UCE-1 to ask around to see if he could find an interested buyer for larger

quantities of this mixture of heroin. UCE-1 agreed to do so, put
the clear plastic bag containing the substance in his pocket and
left the residence. The meeting was recorded and the recording
was made an exhibit and preserved as evidence in the case. The
substance provided by SERVIDIO to the UCE-1 during this meeting
was made a drug exhibit and submitted to the DEA Northeast
Regional Laboratory for analysis, where it was determined by a
DEA forensic chemist to have a net weight of 13.1 grams and
contain tramadol and heroin, both opioids and controlled
substances.

70. On December 19, 2017, UCE-1 met with Michael GALLICCHIO
at a rest area on the Garden State Parkway near mile marker 100.
Prior to the meeting, UCE-1 exchanged multiple text messages
with GALLICCHIO and spoke with him by cell phone call to arrange
the meeting. Additionally, while on the way to the meeting, UCE-
1 called GALLICCHIO to determine where they would meet inside
the rest area parking lot. At approximately 2:19 p.m., UCE-1
arrived in the rest area parking lot in his vehicle and observed
GALLICCHIO standing outside the south side of the rest area
building. UCE-1 stopped his vehicle and GALLICCHIO got in UCE-
1's vehicle on the front passenger side. UCE-1 then parked his
vehicle in the rest area parking lot next to GALLICCHIO'S
vehicle, a black BMW 750.  UCE-1 and GALLICCHIO had a
conversation about Joe SERVIDIO, drug transactions, selling

sneakers and individuals GALLICCHIO believed to be cooperating with law enforcement. Then inside the vehicle, GALLICCHIO gave UCE-1 a plastic zip lock bag containing five smaller plastic bags that based on his discussions with GALLICCHIO, UCE-1 expected to contain approximately 500 heroin pills. UCE-1 placed the pills in the center console of his vehicle. UCE-1 then handed GALLICCHIO $5,000 in U.S. currency in exchange for the pills. ($4,200 in $100 bills, and the remaining $800 in $20 bills). UCE-1 and GALLICCHIO also discussed future drug transactions wherein UCE-1 was interested in purchasing larger quantities of the heroin pills. UCE-1 met with other FBI agents after the meeting and provided them with the purchased pills, which were placed in evidence in the case as a drug exhibit and submitted to the DEA Northeast Regional Laboratory for analysis. A DEA forensic chemist analyzed the drug exhibit and found that the 500 pills submitted as an exhibit had a net weight of 60.2 grams and contained fentanyl, a controlled substance. The meeting and phone calls between UCE-1 and GALLICCHIO were recorded and the recordings were preserved and placed in evidence in the case. The meeting was also observed by FBI surveillance agents who were present in the area of the rest stop during the drug transaction between UCE-1 and GALLICCHIO and observed their meeting.

71. On January 15, 2018, UCE-1 met with Michael GALLICCHIO at a rest area on the Garden State Parkway near mile marker 100. Prior to the meeting, UCE-1 exchanged multiple text messages with GALLICCHIO and spoke with him by cell phone call to arrange the meeting. Additionally, while on the way to the meeting, UCE-1 called GALLICCHIO to determine where they would meet inside the rest area parking lot. At approximately 2:25 p.m., UCE-1 drove into the rest area parking lot in his vehicle and parked next to GALLICCHIO'S BMW, as GALLICCHIO had already arrived in the parking lot. GALLICCHIO got out of his vehicle and entered the front passenger side of UCE-1's vehicle. While seated in the front of UCE-1's vehicle, UCE-1 and GALLICCHIO engaged in a conversation about Joe SERVIDIO, future drug transactions, and other general topics of conversation.  UCE-1 asked GALLICCHIO about the price he was charging for 500 heroin pills, but GALLICCHIO did not provide a specific price in this conversation, but said they would "work something out."  Inside the vehicle, GALLICCHIO handed UCE-1 a clear plastic bag containing seven smaller clear plastic bags that UCE-1 understood from the discussion to contain 660 heroin pills. UCE-1 placed the plastic bag containing the pills in the center console of his vehicle. UCE-1 and GALLICCHIO then transferred three and one half cases of cigarettes into GALLICCHIO'S BMW from UCE-1's vehicle as payment for the pills.  Following the

meeting, UCE-1 left the parking lot and later met up with FBI
case agents and provided them with the pills purchased from
GALLICCHIO. The pills were preserved as a drug exhibit and
submitted by the agents to the DEA Northeast Regional Laboratory
for analysis. A DEA forensic chemist examined the drug exhibit
and determined that the 660 pills submitted had a net weight of
78.8 grams and contained fentanyl, a controlled substance. The
meeting and the phone calls and text messages between UCE-1 and
GALLICCHIO were recorded and preserved as evidence in the case
and the meeting between UCE-1 and GALLICCHIO was also observed
by FBI surveillance agents.

72. On March 2, 2018, UCE-1 met with Michael GALLICCHIO at
a rest area on the Garden State Parkway near mile marker 100.
Prior to the meeting, UCE-1 exchanged multiple text messages
with GALLICCHIO and spoke with him by cell phone call to arrange
the meeting. At approximately 12:42 p.m., GALLICCHIO arrived at
the Monmouth Service area in the same black BMW sedan with NJ
registration (noted by surveillance agents). GALLICCHIO parked
his car and remained in his vehicle.  At 12:51 p.m., UCE-1 drove
into the rest area parking lot in his vehicle and parked next to
GALLICCHIO'S BMW. GALLICCHIO got out of his car and entered the
front passenger seat of UCE-1's vehicle. While in the car
together, UCE-1 and GALLICCHIO had a general discussion about
Joseph SERVIDIO and Carl CHIANESE. GALLICCHIO mentioned to UCE-1

that he had spent time in jail with CHIANESE.[13]  GALLICCHIO then
told UCE-1 that he had an individual that wanted 5 cases of
Newport cigarettes per week if UCE-1 could get them. GALLICCHIO
then told UCE-1 that his connection (source of supply) for weed
(marijuana) in California is sending him a sample of
methamphetamine that he is still waiting for. According to
GALLICCHIO, the connection is willing to send pounds of
methamphetamine to GALLICCHIO but doesn't want to do it on a
weekly basis, but would rather send more weight and less

---

[13] Michael GALLICCHIO has a prior conviction in the United States District
Court for the District of New Jersey (Criminal No. 05-441-2 (JAP)) for
conspiring to distribute a controlled substance (oxycodone pills), which
resulted from his arrest by law enforcement agents in June 2005. GALLICCHIO
pled guilty and on April 25, 2006, he was sentenced by the Honorable Joel
Pisano to 108 months imprisonment, to be followed by 3 years of supervised
release, and ordered to pay $75,000 in forfeiture to the government.
According to BOP records, GALLICCHIO was released from custody on July 29,
2013. Carl CHIANESE has two prior convictions for the distribution of
methamphetamine, one from a federal case in this district and another from a
federal case in the Middle District of Pennsylvania. In the Middle District
of Pennsylvania case, he pled guilty and on December 18, 1998, he was
sentenced to 262 months imprisonment, followed by 5 years of supervised
release. In the District of New Jersey case, CHIANESE pled guilty to
Conspiracy to Distribute Methamphetamine and on January 21, 2000, he was
sentenced by the late, Honorable Joseph E. Irenas to a 210 month term of
imprisonment, 198 months to run concurrently with the sentence above and 12
months to run consecutively, and with 5 years of supervised release to
follow. On January 12, 2015, Judge Irenas signed an order granting a motion
to reduce CHIANESE'S sentence to "time served" after he had served over 17
years and 7 months of his sentence (approximately 77%). The Order was signed
and entered on January 12, 2015. CHIANESE is currently on the District
Court's supervised release. (See Criminal No. 98-0008-02 (JEI)). Joseph
SERVIDIO also has a felony federal drug conviction for the distribution of
cocaine. SERVIDIO was arrested in July 2006 and pled guilty to two counts of
distribution of a controlled substance (cocaine) in September 2006. On
December 13, 2006, SERVIDIO was sentenced by the Honorable William J. Martini
to 60 months imprisonment, to be followed by 4 years of supervised release.
According to BOP records, SERVIDIO was released on or about April 26, 2011.
(See Criminal No. 06-0709-1 (WJM)).

frequent shipments. GALLICCHIO then handed UCE-1 a small bag that was represented to be 200 heroin pills and another bag that he said contained $7,000 in cash that represented payment to UCE-1 for 5 cases of Newport cigarettes GALLICCHIO received from UCE-1 at a meeting on February 19, 2018. The pills were turned over by UCE-1 to other assigned FBI agents, who placed them in evidence and arranged for the evidence exhibit containing the pills to be sent to the DEA Northeast Regional Laboratory for analysis.

Wherefore, your Affiant submits that there is probable cause to believe that JOSEPH SERVIDIO, CARL CHIANESE AND MICHAEL GALLICCHIO have conspired to possess with the intent to distribute and distribute controlled substances, including 100 grams or more of heroin and a detectable amount of fentanyl, Schedule I controlled substances and 50 grams or more of methamphetamine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A), in violation of Title 21, United States Code, Section 846.